**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Darren Wietecha,<br><br>        Plaintiff,<br><br>  vs.<br><br>Ameritas Life Insurance Corp., Ameritas Variable Life Ins. Co., Acacia Life Ins. Co., the Ameritas/Acacia Companies, et al.,<br><br>        Defendants. | No. CIV 05-0324-PHX-SMM<br><br>**MEMORANDUM OF DECISION AND ORDER** |

Plaintiff, Darren Wietecha ("Plaintiff"), is a former employee of defendants Ameritas/Acacia (collectively, "Defendants").  In a complaint filed on December 30, 2004, Plaintiff alleged five claims against Defendants:  defamation, breach of contract, wrongful discharge, intentional infliction of emotional distress, and negligence/negligence per se.  (Dkt. 1, Ex. A.)  On August 8, 2005, this Court granted Defendants' Motion for Judgment on the Pleadings on Plaintiff's breach of contract and wrongful discharge claims.  (Dkt. 25.)

Defendants now move for summary judgment on the remaining three claims, defamation, intentional infliction of emotional distress, and negligence/negligence per se. (Dkt. 44.) Although he has not properly filed a cross-motion for summary judgment, Plaintiff generally responds that he "is the party entitled to summary judgment" on the remaining three claims. (Dkt. 50 at 5.)  Also pending is a motion by Defendants to strike various parts of Plaintiff's Statement of Controverting Facts. (Dkt. 58.)  For the reasons that follow, the Court will grant

1    summary judgment in Defendants' favor.[1]

2                         **FACTUAL BACKGROUND**[2]

3    **A.    Facts Relating to Plaintiff's Termination**

4          Defendants provide life insurance, annuities, and other investment products and services.

5    (Dkt. 45 at ¶1.)  Plaintiff became a contracted sales agent for Defendants in October 2003.  (Id.

6    at ¶2.)  In addition to sales of life insurance and investment products, Plaintiff was a sales

7    manager responsible for recruiting and training other producers.  (Id. at ¶2, Ex. A at ¶3.)

8    Plaintiff was eligible to receive annualized commissions based on the amount of life insurance

9    and annuity production generated by him on a monthly basis.  (Id. at ¶4, Ex. A at ¶5.)

10         On March 15, 2004, Plaintiff's agency contract was terminated after Defendants

11   conducted an investigation and determined that he had engaged in deceptive practices and

12   insurance fraud.  (Dkt. 45 at ¶¶3-6, Ex. F at ¶4; Dkt. 57 at ¶¶34-36, Ex. A at ¶¶14-15.)

13   Specifically, Defendants determined that, in order to receive annualized commissions on a

14   greater amount of insurance, Plaintiff had applied for a high value life insurance policy on his

15   own life using inaccurate personal financial information to secure a higher face amount policy.[3]

16   _____

17         [1]  The parties have had the opportunity to submit evidence and briefing, and the Court would
18   not find oral argument helpful in resolving this matter.  Accordingly, the Court finds the pending
     motion for summary judgment suitable for decision without oral argument. See LRCiv 56.2; Local
19   Rules of Civil Procedure ("LRCiv") of the United States District Court for the District of Arizona
20   7.2(f); Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp., 933 F.2d 724, 728-29
     (9th Cir. 1991) ("When a party has an adequate opportunity to provide the trial court with evidence and
21   a memorandum of law, there is no prejudice" when oral arguments are not held on motions for
     summary judgment.).

22         [2] This section sets forth undisputed material facts from the parties' separate Statements of Facts
23   (see dkts. 45, 51, 57), and draws all inferences the evidence reasonably can support in favor of Plaintiff,
     as the nonmoving party.  The Court determined which facts are undisputed only after ruling on
24   Defendants' Motion to Strike (dkt. 58), which is discussed infra at 28-29.

25         [3]  According to schedules dated October 16, 2003, which Plaintiff filed in his bankruptcy, he
26   had $15,800 in assets and $147,360.58 in liabilities, resulting in a negative net worth. (Dkt. 57 at ¶27,
     Ex. A at ¶15 and Ex. D to Ex. A.)  In his November 8, 2003 application for insurance, however,
27   Plaintiff listed his net worth as $500,000.  (Dkt. 57 at ¶27, Ex. A at ¶15 and Ex. E to Ex. A.) Plaintiff
     contends he did not "intentionally" use exaggerated numbers on any application for insurance (dkt. 51
28   at ¶3), but does not dispute that he submitted an insurance application in which his represented net

1  (Dkt. 45 at ¶4; Dkt. 57 at ¶¶27, 35, Ex. A at ¶15.)  Defendants investigated Plaintiff's conduct

2  and further determined that he had designed a plan through which he and other producers could

3  meet their sales goals and receive subsidies by applying for large insurance policies on their

4  own lives.  (Dkt. 45 at ¶¶ 3, 6; Dkt. 57 at ¶34, Ex. A at ¶14 and Ex. C to Ex. A.)  Based on the

5  results of their investigation, Defendants concluded that Plaintiff had been dishonest in

6  contravention of the Companies' standards of ethics and integrity, and therefore violated

7  industry standards of conduct.  (Dkt. 45, Ex. D at ¶9; Dkt. 57 at ¶36, Ex. B.)

8  **B.**    **Facts Relating to The U-4 and U-5 Forms Filed by Defendants**

9        Under the National Association of Securities Dealers' (the "NASD") rules, a U-4 Form

10  must be filed whenever a registered representative becomes associated with a broker-dealer.

11  (Dkt. 45, Ex. D at ¶2.)  A U-4 Form sets forth the registered representative's employment and

12  disciplinary history by requiring the representative to disclose information about his or her

13  involvement in any criminal matters, regulatory actions, civil actions, customer complaints,

14  terminations from employment, and bankruptcies.  (Dkt. 45 at ¶8, Ex. C, Ex. D at ¶2.)

15        In addition to U-4 Forms, NASD's Rule 3070 requires member firms to "promptly

16  report" those employees who are subject to discipline, including termination, by filing a U-5

17  Form stating the reason(s) for termination and an explanation for the action.  (Dkt. 45 at ¶17,

18  Ex. F at ¶3 and Ex. A to Ex. F.)  The NASD uses information disclosed in U-5 Forms to

19  conduct its own investigation into whether "violations of the federal securities laws, regulations,

20  or NASD rules have occurred."  (Dkt. 45 at ¶18.)

21        Information disclosed in both U-4 and U-5 Forms is compiled into a Central Records

22  Depository (the "CRD"), a regulated database maintained and administered by the NASD,

23  which is published to broker-dealers, the public, and potential clients.  (Dkt. 45 at ¶9, Ex. D at

24  ¶3 and Ex. A to Ex. D.)  If a broker-dealer discovers any inaccuracy in a registered

25  representative's U-4 Form, the broker-dealer is required to amend the representative's U-4

26  within thirty days of the date the inaccuracy is first discovered.  (Dkt. 45 at ¶15, Ex. D at ¶5.)

27  _____

28  worth was inaccurate.  See Dkt. 51 at ¶¶3, 9; Dkt. 52, Ex. C at 1; Dkt. 57, Ex. A at Ex. E to Ex. A.

1   Even if a registered representative fails to physically sign an amended U-4 Form, the broker-

2   dealer is obligated to make the appropriate amended U-4 filing.  (Dkt. 45, Ex. D at ¶5.)

3       On September 10, 2003, The Advisors Group ("TAG"), a former NASD member and

4   affiliate of Defendants, completed and submitted a U-4 Form to reflect Plaintiff's new

5   association with Defendants.  (Dkt. 45 at ¶10, Ex. C.)  The September 10, 2003 U-4 Form was

6   based on information Plaintiff had provided to TAG and was signed by Plaintiff.  (Dkt. 45 at

7   ¶¶10-11.)  By signing his U-4 Form, Plaintiff agreed to ensure that his U-4 remained current

8   and accurate.  (Dkt. 45, Ex. D at ¶7.)

9       In late September 2003, after reviewing the CRD, TAG discovered conduct not

10  previously disclosed by Plaintiff to TAG at the time his U-4 was prepared and submitted, and

11  thus not disclosed by TAG to the NASD.  (Dkt. 45 at ¶¶12, 13, Ex. D at ¶5 and Ex. A to Ex. D.)

12  Specifically, Plaintiff's CRD record revealed that Met Life, one of his previous employers, had

13  discharged Plaintiff in 1990 for "unethical practices."[4]  (Dkt. 45 at ¶13, Ex. D at ¶3 and Ex. A

14  to Ex. D at p.4.)

15      Based on the CRD record, Defendants determined that the U-4 Form needed to be

16  corrected because TAG and Defendants had become aware of facts required to be reported that

17  were not previously disclosed and were inconsistent with the U-4 submitted to the NASD.

18  (Dkt. 45 at ¶¶14, 15, Ex. D at ¶5.)  Accordingly, on October 24, 2003, Defendants filed an

19  amended U-4 Form containing the same information disclosed by Met Life that appeared in

20  Plaintiff's CRD record.  (Dkt. 45 at ¶16, Ex. D at ¶¶3, 6; Dkt. 57, Ex. G to Ex. A.)  Defendants

21  believed TAG was required to update the U-4 Form previously submitted.  (Dkt. 45 at ¶¶14-15,

22  Ex. D at ¶5; Dkt. 57 at ¶33, Ex. A at ¶¶17-18, 22.)

23

24

_____

25      [4]  Question 14J(1) on the U-4 Form asks, "Have you ever voluntarily resigned, been discharged

26  or permitted to resign after allegations were made that accused you of: (1) violating investment-related
    statutes, regulations, rules, or industry standards of conduct?"  (Dkt. 45, Ex. C at p.11.)  Although

27  Plaintiff had told TAG there were no such instances, his CRD reflected that Met Life had terminated
    him for alleged "unethical practices," which constitutes an allegation of violating industry standards

28  of conduct.  (Dkt. 45, Ex. D at ¶9 and Ex. A to Ex. D at p.4.)

1    Defendants amended Plaintiff's U-4 Form a second time four days later, on October 29,

2    2003 to report that the two-year reporting period for a customer complaint against Plaintiff had

3    expired.  (Dkt. 45 at ¶13, Ex. D at ¶3, Ex. E.)

4         As a result of Defendants' decision to terminate Plaintiff, Defendants filed a U-5 Form

5    on March 16, 2004.  (Dkt. 45 at ¶19, Ex. F at ¶2 and Ex. A to Ex. F.)  Based on its conclusion

6    that Plaintiff had been dishonest in contravention of the Companies' standards of ethics, the U-5

7    Form stated that Plaintiff was "discharged" for "failure to abide by company policies and

8    procedures."  (Dkt. 45 at ¶19, Ex. F at ¶4 and Ex. A to Ex. F at pp.1,4; Dkt. 57 at ¶¶36-37, Ex.

9    B.)  Although the U-5 Form provided no information concerning the facts surrounding

10   Plaintiff's termination, it stated "Yes," to the question whether, at the time of termination,

11   Plaintiff was under internal review for "violating investment-related statutes, regulations, rules

12   or industry standards of conduct."  (Dkt. 45, Ex. A to Ex. F at pp.2-3.)  The U-5 also stated

13   "Yes," to the question whether Plaintiff was discharged after allegations were made that

14   accused him of "violating investment-related statutes, regulations, rules or industry standards

15   of conduct."  (Dkt. 45, Ex. A to Ex. F at p.3.)

16         After further discussions with Plaintiff, and as an accommodation to him, Defendants

17   amended the U-5 Form by changing the basis for termination from "failure to abide by company

18   policies and procedures" to "permitted to resign."  (Dkt. 45 at ¶20, Ex. F at ¶5.)  Accordingly,

19   on April 29, 2004, Defendants amended the U-5 Form by adding the following comment to

20   page 5: "After reinvestigating the termination of [Plaintiff], it was decided that he was permitted

21   to resign his securities registration with the firm."  (Dkt. 45 at ¶¶20-21, Ex. F at ¶5 and Ex. B

22   to Ex. F at p.5.)  Plaintiff was notified that all other provisions of his termination remained in

23   full force and effect.  (Dkt. 45 at ¶22, Ex. F at ¶6, Ex. H.)

24                              **STANDARD OF REVIEW**

25         A court must grant summary judgment if the pleadings and supporting documents,

26   viewed in the light most favorable to the nonmoving party, "show that there is no genuine

27   issue as to any material fact and that the moving party is entitled to judgment as a matter of

28   law."  FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law determines which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130.  Thus, mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id.; see Jesinger, 24 F.3d at 1130.

The movant on a summary judgment motion bears the initial burden of providing a legal basis for its motion and identifying portions of the record which demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  If the moving party meets its burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); see Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Jt.Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).  All inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party, Eastman Kodak Co. v. Image Tech'l Servs., Inc., 504 U.S. 451, 456 (1992), but inferences must be based on evidence which would be sufficient to support a judgment for the nonmoving party.  Celotex, 477 U.S. at 322.  Moreover, inferences  cannot be created by pointing to "some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Deference to the nonmoving party has limits: (i) a plaintiff cannot rest on allegations in his pleadings to overcome a motion for summary judgment (Brinson, 53 F.3d at 1049); and (ii) self-serving affidavits do not establish a genuine issue of material fact if they fail to state facts based on personal knowledge or are too conclusory (Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001)).

/ / /

/ / /

/ / /

**DISCUSSION**

**A.  Claim 1: Defamation**

In Claim One, Plaintiff contends Defendants defamed him when they (i) falsely made statements "within the industry" that he had not reported a bankruptcy filing; (2) falsely made statements "within the industry" that he "was fraudulent in his purchase of a security-related investment, a Variable Universal Life Insurance Policy" (the "VUL Policy"); (iii) amended his U-4 Form; and (iv) "published false and defamatory statements about [him] on the Form U-5 published on or about March 16, 2004."  (Dkt. 50 at 6.)  Defendants respond that, to the extent Plaintiff's defamation claim is based on the amended U-4 Forms, it is barred by Arizona's one-year statute of limitations.  Defendants further contend, even if the statute of limitations does not bar the U-4 allegations, Plaintiff has failed to present evidence that (i) Defendants "published" statements regarding his bankruptcy or the fraudulent purchase of a VUL Policy; (ii) statements in the U-4 and U-5 Forms are false; and (iii) Defendants knew the falsity of the U-4 and U-5 statements or had serious doubts as to their truth (i.e., that statements in the U-4 and U-5 Forms were made with "malice").

**1.     The Statute of Limitations Bars Plaintiff's U-4 Form Allegations**

Under Arizona law, the statute of limitations for libel or slander is one year.  See A.R.S. § 12-541.  Arizona's general defamation rule provides that a defamation action accrues – and the statute of limitations begins to run – upon publication.  Boatman v. Samaritan Health Services, Inc., 812 P.2d 1025, 1031 (Ariz. Ct. App. 1990).  In cases where "the defamation is published in a manner in which it is peculiarly likely to be concealed from the plaintiff, such as in a confidential memorandum or a credit report," the "rule of discovery" applies, which tolls the statute of limitations until the publication is discovered or reasonably should have been discovered.  See Clark v. Airesearch Manufacturing Co. of Arizona, 673 P.2d 984, 986-87 (Ariz. Ct. App. 1983) (rule of discovery does not "extend to defamatory remarks not made in an inherently secretive or confidential manner").

In the present case, Plaintiff contends Defendants defamed him on October 24, 2003 and October 29, 2003, when they submitted U-4 Forms containing false and defamatory

statements.  (Dkt. 51 at ¶¶18-20.)  Plaintiff avers that Defendants submitted the amended U-4s "without [his] authorization" (dkt. 52 at ¶¶19-20), but has presented no evidence that Defendants submitted the amended Forms in an "inherently secretive" or "confidential manner," nor has he presented evidence that he could not have discovered the amended U-4 Forms earlier.  To the contrary, because both amended U-4 Forms were public documents published in the CRD and available to Plaintiff at any time (see Dkt. 45 at ¶9, Ex. D at ¶3 (information disclosed in U-4 Forms is compiled into a regulated database available to the public)), Arizona's discovery rule does not apply.  Thus, Plaintiff's allegations concerning the defamatory statements contained in the U-4 Forms published on October 24, 2003 and October 29, 2003 are barred by Arizona's one-year statute of limitations (A.R.S. §12-541).  See Dkt. 1, Ex. A (complaint filed on December 30, 2004).

Even assuming, *arguendo*, Plaintiff's U-4 allegations are not time-barred, the Court finds that Plaintiff has failed to present evidence from which a reasonable jury could find in his favor on any of the alleged defamatory statements.  Thus, summary judgment will be granted in favor of Defendants on the defamation claim.

## 2. Plaintiff has Failed to Raise a Genuine Issue of Material Fact as to Publication of Two Statements

In Arizona, the elements of a defamation claim involving a non-public figure are: (1) a false statement concerning the plaintiff; (2) the statement was defamatory; (3) the statement was published to a third party; and (4) the plaintiff was damaged as a result of the statement.  Morris v. Warner, 770 P.2d 359, 366 (Ariz. Ct. App. 1988).  Publication or communication of the defamatory statement to a third party other than the person defamed is an essential element of an action for defamation.  See Restatement (Second) of Torts, §577(1) (2006) ("[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed"); Wilson v. United States Elevator Corp., 972 P.2d 235, 239 (Ariz. Ct. App. 1998) (absent contrary precedent, Arizona courts generally follow the Restatement (Second) of Torts §1, et seq.).  In other words, if a person makes a defamatory statement about another person but that statement is not conveyed to a

1   third party, no publication has occurred.  Restatement (Second) of Torts, §577(1); see also

2   Johnson v. Martin, 943 F.2d 15 (7th Cir. 1991) (damaging information in discharged public

3   employee's personnel file not considered publication for defamation claims).

4        In the present case, Plaintiff contends Defendants defamed him by falsely making

5   statements "within the industry" that he had (i) not reported a bankruptcy filing; and

6   (ii) fraudulently purchased a VUL Policy.  (Dkt. 50 at 6.)  However, Plaintiff has presented

7   no evidence that Defendants "published" either defamatory statement.

8        The context in which Plaintiff refers to the bankruptcy statement confirms that there

9   is no genuine issue of material fact as to whether Defendants communicated such

10  defamatory statement to a third party.  Plaintiff avers, "[o]n or about March 10, 2004,

11  [Defendants] initially informed me that my termination . . . was based on the fact that I had

12  filed Chapter 7 bankruptcy and did not disclose such filing to [Defendants]."  (Dkt. 52 at ¶4,

13  emphasis added.)  Plaintiff submits no evidence to support the conclusory assertion in his

14  brief that Defendants communicated this statement to a third party, let alone "within the

15  industry" (dkt. 50 at 6); indeed, in his own affidavit Plaintiff does not even state that this

16  assertion was made to anyone other than himself.  See dkt. 52.  Thus, there is no genuine

17  issue of material fact as to whether Defendants defamed Plaintiff by falsely stating that he

18  had not reported a bankruptcy filing.  (Id.)

19       Similarly, there is no evidence that Defendants defamed Plaintiff by falsely

20  communicating to a third party that Plaintiff had fraudulently purchased a VUL Policy.

21  Plaintiff avers, "[o]n or about March 17, 2004, [Defendants] informed me their

22  'investigation' had produced evidence such that I would be terminated based on a Variable

23  Universal Life insurance policy . . . that supposedly was fraudulent, . . . and then defendants

24  wrongfully reported same to the NASD."  (Dkt. 52 at ¶6, emphasis added).  Once again,

25  Plaintiff submits no evidence to support the conclusory assertion in his brief that Defendants

26  published the VUL Policy statement (dkt. 50 at 6).  Instead, he avers that Defendants

27  "wrongfully reported this information on Form U-5 at ¶7F(1)."  See dkt. 52 at ¶8.  Rather

28  than stating that Plaintiff was terminated for fraudulently purchasing a VUL Policy,

however, item 7F(1) in both U-5 Forms simply answers "Yes," to the question whether Plaintiff was discharged "after allegations were made that accused [him] of violating investment-related statutes, regulations, rules or industry standards of conduct." See Dkt. 45, Ex. A to Ex. F at p.3 and Ex. B to Ex. F at p.3; Dkt. 51, Ex. 1 at p.3.   The evidence is undisputed, however, that, based on the results of their investigation, Defendants concluded that Plaintiff had been dishonest in contravention of the Companies' standards of ethics and integrity, and therefore violated industry standards of conduct.  (Dkt. 45, Ex. D at ¶9; Dkt. 57 at ¶36, Ex. B.)  Moreover, neither U-5 Form states that Plaintiff fraudulently purchased a VUL Policy.  To the contrary, where the DRP asks for the "Principal Product Type" involved in the termination, both U-5 Forms state, "No product." See Dkt. 45, Ex. A to Ex. F at p.5 and Ex. B to Ex. F at p. 5.  Because Plaintiff has failed to demonstrate that Defendants published the VUL Policy statement to a third party, there is no genuine issue of material fact as to whether Defendants defamed Plaintiff by falsely stating that he fraudulently purchased a VUL Policy. (Dkt. 50 at 6.)

### 3. With Respect to the U-4 and U-5 Forms, Plaintiff Has Failed To Raise a Genuine Issue of Fact as to Falsity

In Arizona, "substantial truth is sufficient to defeat an action for defamation." Fendler v. Phoenix Newspapers Inc., 636 P.2d 1257, 1260-61 (Ariz. Ct. App. 1981).  The theory behind allowing substantial truth, like absolute truth, to constitute a defense to defamation is that a defendant should not be required to justify every word of the alleged defamatory matter; "it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge be established by the evidence, the defendant has made his case." Id. at 1261.  Although "it is the function of a jury to determine factually whether an allegedly defamatory statement is true," if the parties agree on either the contents of the allegedly defamatory document or the inferences to be drawn therefrom, there is no factual determination for the jury to make. Id. at 1261-62.  Rather, the issue is then for the Court to determine whether the "gist" or "sting" of the libelous charge was substantially different from the actual truth. Id. at 1262.  In the present case, there is no dispute over the

1   contents of the U-4 and U-5 Forms that Plaintiff claims contain false and defamatory

2   statements.  Thus, the Court will decide whether the Forms published by Defendants contain

3   false statements on which a claim for defamation can be based.  Id. ("where the underlying

4   facts are undisputed, the determination of substantial truth is a matter for the court").

5           **a.     The U-4 Forms**

6                   **The October 24, 2003 U-4 Form**

7                   It is not disputed that, on October 24, 2003, Defendants filed an amended U-4

8   Form containing the same information disclosed by Met Life that appeared in Plaintiff's

9   CRD record.  (Dkt. 45 at ¶16, Ex. D at ¶¶3, 6; Dkt. 57, Ex. G to Ex. A.)  To do so,

10  Defendants made the following changes to the U-4 initially filed on September 10, 2003:

11                  (i) To the question in section 14J(1), whether Plaintiff had ever "voluntarily

12                  resigned, been discharged or permitted to resign after allegations were made

13                  that accused [him] of violating investment-related statutes, regulations, rules,

14                  or industry standards of conduct," Defendants changed the response from

15                  "No" to "Yes" (compare Dkt. 45, Ex. C at p. 11 with Dkt. 57, Ex. G to Ex. A

16                  at p.11); and

17                  (ii) To the "Termination DRP" section of the Form, Defendants changed the

18                  response from "No Information Filed" to include the name of the firm that

19                  terminated Plaintiff –  "Met Life"; the type of termination – "Discharge" on

20                  "7/09/1990"; and the allegations against Plaintiff – "Unethical Practices."

21                  Compare Dkt. 45, Ex. C, p. 19 With Dkt. 57, Ex. G to Ex. A at pp.17-18.

22  Substantively, the information Defendants added to Plaintiff's October 24, 2003 U-4 Form

23  was the very same information shown and available to the public on Plaintiff's CRD record.

24  Compare Dkt. 45, Ex. A to Ex. D at p. 4 With Dkt. 57, Ex. G to Ex. A at pp. 11, 17-18.

25  Moreover, as amended by Defendants, the October 24, 2003 U-4 Form did not contain any

26  information other than the information stated on the U-5 Form filed by Met Life when it

27  discharged Plaintiff in 1990.  Compare Dkt. 51, Ex. 7 With Dkt. 57, Ex. G to Ex. A at pp.

28  11, 17-18.  Finally, Plaintiff does not contend that the information provided on Met Life's

1   U-5 Form was false and defamatory, nor does he dispute that the reason Met Life discharged

2   him was "alleged unethical practices."  (Dkt. 50 at 3-5, 8-9.)

3          Plaintiff's contention with respect to the October 24, 2003 U-4 Form appears

4   to result from his disagreement with Defendants' decision to amend his original U-4 Form.

5   Specifically, Plaintiff argues that Defendants "acted in reckless disregard for the accuracy or

6   truth of" Met Life's disclosure because Met Life answered "No," to the question whether

7   Plaintiff "was currently or at termination under internal review for fraud or wrongful taking

8   of property."  (Dkt. 50 at 8; Dkt. 51 Ex. 7.)  This argument misses the mark, however,

9   because the amended U-4 Form neither states nor implies that Plaintiff was terminated from

10  Met Life for fraud or the wrongful taking of property.  See Dkt. 57, Ex. G to Ex. A.

11         To the extent Plaintiff bases his defamation claim on Defendants' affirmative

12  response to whether he had ever "been discharged . . . after allegations were made that

13  accused [him] of violating investment-related statutes, regulations, rules, or industry

14  standards of conduct," the Court finds Defendants' response is not false for two reasons.

15         First, Plaintiff does not dispute that Met Life discharged him for alleged

16  "unethical conduct."  See Dkt. 50 at 3-5, 8-9.  Second, there can be no serious dispute that

17  unethical conduct – whether related to the sale of a security or not – violates "industry

18  standards of conduct," because unethical conduct directly relates to the NASD's goal and

19  function of "insur[ing] fair dealing and . . . protect[ing] investors from harmful or unfair

20  trading practices." See Credit Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119, 1128-

21  29 (9th Cir. 2005) ("Congress's aim in providing for supervised self-regulation [in the

22  securities industry by organizations such as the NASD] was 'to insure fair dealing and to

23  protect investors from harmful or unfair trading practices.'") (quotation omitted); Gurfel v.

24  Secs. & Exchange Comm'n, 205 F.3d 400 (D.C. Cir. 2000) (the NASD "is an association of

25  broker-dealers authorized under the Securities Exchange Act to develop and enforce rules of

26  professional conduct for its member firms, subject to oversight by the SEC") (emphasis

27  added); Jones v. Secs. & Exchange Comm'n, 115 F.3d 1173, 1182 (4th Cir. 1997) ("Under

28  the Maloney Act, the NASD is authorized to regulate itself by prohibiting and preventing

1   fraud and *unethical conduct* by its members . . .") (emphasis added); <u>see also</u> <u>Alderman v.</u>

2   <u>Secs. & Exchange Comm'n</u>, 104 F.3d 285, 287 n.2 (9th Cir. 1997) (Article I, § 5(a) of the

3   NASD Rules provides that "[p]ersons associated with a member shall have the same duties

4   and obligations as a member under these Rules of Fair Practice").  Moreover, Defendants

5   have submitted uncontradicted evidence that "[u]nethical practices constitutes a violation of

6   industry standards of conduct."  <u>See</u> Dkt. 45, Ex. D at ¶9.  Plaintiff's unsupported and

7   conclusory assertion that his discharge from Met Life was not required to be reported does

8   not raise a genuine issue of material fact as to whether Defendants' amendment to report the

9   circumstances of his discharge from Met Life was false.  At the very least, Defendants'

10  representation that Met Life discharged Plaintiff in 1990 after allegations "of violating

11  investment-related statutes, regulations, rules, or industry standards of conduct" is

12  substantially truthful, and therefore sufficient to defeat Plaintiff's claim for defamation

13  based on the October 24, 2003 U-4 Form.  <u>See</u> <u>Fendler</u>, 636 P.2d at 1260-61.

14                          **<u>The October 29, 2003 U-4 Form</u>**

15           Plaintiff's September 10, 2003 U-4 Form clearly demonstrates the accuracy of

16  the amended U-4 submitted by Defendants on October 29, 2003.  Plaintiff contends he was

17  defamed when Defendants amended the answer to Paragraph 14I(3)(a), which asked

18  whether, within the past twenty-four months, he had been the subject of an investment-

19  related, consumer-initiated, written complaint, not otherwise reported.  <u>See</u> Dkt. 51 at ¶20.

20  Plaintiff's initial U-4 Form, filed on September 10, 2003 by TAG based on information

21  provided by Plaintiff, answered "Yes" to question 14I(3)(a), because of a customer

22  complaint filed on October 3, 2001 alleging a $71,000 loss.  <u>See</u> Dkt. 45, Ex. C at pp. 11,

23  17.  On the October 29, 2003 amended U-4 Form, TAG changed the answer to question

24  14I(3)(a) from "Yes," to "No," because, after October 3, 2003, the incident was more than

25  twenty-four months old and no longer required to be reported.  <u>See</u> Dkt. 45, Ex. E at pp. 11,

26  15.  Because Plaintiff does not dispute that the initial U-4 Form was correct, he cannot (and

27  has not) shown that the amended U-4 was false.  Because statements in the October 29, 2003

28

1  U-4 Form are truthful, summary judgment will be granted for Defendants on Plaintiff's

2  claim for defamation based on the October 29, 2003 U-4 Form.

3  <center>**The February 13, 2004 U-4 Form**</center>

4        As Plaintiff concedes, the amended U-4 Form submitted on February 13, 2004 was

5  filed to change the firm's name from "The Advisors Group" to "Ameritas Investment Corp."

6  (Dkt. 51 at ¶21.)  Plaintiff has not presented any evidence to demonstrate that this name

7  change did not occur, or that Defendants' statements in the February 13, 2004 U-4 are not

8  truthful.  Thus, summary judgment will be granted for Defendants on Plaintiff's claim for

9  defamation based on the February 13, 2004 U-4 Form.

10       **b.    The U-5 Form**

11        In his affidavit, Ronald Baregi, the Second Vice President Individual Distribution for

12  Defendant Ameritas Life Insurance Corp., avers that Plaintiff's agency contract was

13  terminated after Defendants conducted an investigation and determined that he had engaged

14  in deceptive practices and insurance fraud.  (Dkt. 45 at ¶¶3-6, Ex. F at ¶4; Dkt. 57 at ¶¶34-

15  36, Ex. A at ¶¶14-15.)  Specifically, Defendants determined that, in order to receive

16  annualized commissions on a greater amount of life insurance, Plaintiff had applied for a

17  large life insurance policy on his own life using inaccurate personal financial information to

18  secure a higher face amount policy.   (Dkt. 45 at ¶4; Dkt. 57 at ¶¶27, 35, Ex. A at ¶15.)

19  Defendants investigated Plaintiff's conduct and further determined that he had designed a

20  plan through which he and other producers could meet their sales goals and receive

21  subsidies by applying for large insurance policies on their own lives.   (Dkt. 45 at ¶¶ 3, 6;

22  Dkt. 57 at ¶34, Ex. A at ¶14 and Ex. C to Ex. A.)  Based on the results of their investigation,

23  Defendants concluded that Plaintiff had been dishonest in contravention of the Companies'

24  standards of ethics and integrity, which violated "industry standards of conduct."  (Dkt. 45,

25  Ex. D at ¶9; Dkt. 57 at ¶36, Ex. B.)  Defendants' conclusion was supported by (i) a

26  statement that Plaintiff had instructed co-workers to lie about their net worth and salary in

27  order to write large insurance policies on themselves, upon which they would receive

28

<center>- 14 -</center>

1   commissions; and (ii) proof that Plaintiff misrepresented his net worth on a high value

2   insurance application.  See Dkt. 57 at ¶¶27, 34, Ex. A at ¶¶14-15 and Exs. C-D to Ex. A.

3        Without rebutting this evidence directly,[5] Plaintiff argues that the truth of the basis

4   for his termination is at issue because: (1) he did not in fact violate investment-related

5   statutes, regulations, rules, or industry standards of conduct; and (2) he did not engage in

6   fraud as to a VUL Policy.  Plaintiff appears to seek to have the Court review the merits of

7   whether or not he in fact violated any investment-related rules or attempted to fraudulently

8   purchase a VUL Policy.  This is not, however, the issue before the Court. See Dkt. 25

9   (granting Defendants' Motion for Judgment on the Pleadings on Plaintiff's breach of

10  contract and wrongful discharge claims).  The issue here is whether the statements published

11  in the March 16, 2004 U-5 Form are substantially true.

12       The U-5 Form at issue states that, at the time of termination, Plaintiff was under

13  internal review for violating investment-related statutes, regulations, rules or industry

14  standards of conduct.  See Dkt. 45, Ex. A to Ex. F at pp. 2-3.  The corresponding DRP of the

15  U-5 Form states that: (1) Defendants initiated an internal review on March 2, 2004; (2) the

16  nature of the internal review and basis for the investigation were allegations that Plaintiff

17  had "fail[ed] to abide by [the] Company's policies and procedures"; and (3) the result of the

18  internal review was Plaintiff's discharge on March 16, 2004.  The U-5 Form does not state

19  that Plaintiff violated any investment-related statute, regulation, rule or industry standard of

20  conduct; it merely states that he was *under investigation for allegedly violating an*

21  *investment-related statute, regulation, rule, or industry standard of conduct at the time of*

22  *termination*.  Moreover, the U-5 Form nowhere states that Plaintiff engaged in fraud with

23  respect to a VUL Policy.  See Dkt. 45, Ex. A and B to Ex. F; supra at 9-10.  Importantly,

24  Plaintiff has not presented any evidence to demonstrate that these statements, which were

25

26        [5] For example, Plaintiff contends he did not "intentionally" use exaggerated numbers on any
27  life insurance policy he wrote for himself (dkt. 51 at¶¶1, 3), but does not dispute that he submitted a
    high value insurance application that included an inaccurate net worth.  See Dkt. 51 at ¶9; Dkt. 52, Ex.
28  C at 1; Dkt. 57, Ex. E to Ex. A.

published in the March 16, 2004 U-5 Form, are false, nor does he even contend any of these statements are false. Because the issue here is whether the statements published in the March 16, 2004 U-5 Form are substantially true – *not* whether Plaintiff *did in fact violate* industry standards of conduct – there is no genuine issue of material fact as to whether the statements in the March 16, 2004 U-5 Form are substantially true.

Moreover, the affidavits and evidence submitted by Defendants demonstrate the truth of the statements on the U-5 Form. Plaintiff has failed to produce any evidence that contradicts Defendants' affidavits, which conclusively establish that he was internally investigated for having applied for a high value life insurance policy on his own life using inaccurate personal financial information (Dkt. 45 at ¶4; Dkt. 57 at ¶¶27, 35, Ex. A at ¶15) and having designed a plan through which he and other producers could meet their sales goals by applying for large insurance policies on their own lives (dkt. 45 at ¶¶ 3, 6; dkt. 57 at ¶34, Ex. A at ¶14 and Ex. C to Ex. A). Defendants' affidavits further demonstrate their conclusion that Plaintiff had been dishonest in contravention of the Companies' standards of ethics, and thus violated "industry standards of conduct." (Dkt. 45, Ex. D at ¶9; Dkt. 57 at ¶36, Ex. B.) As discussed above, it cannot reasonably be disputed that engaging in unethical practices constitutes a violation of industry standards of conduct. See supra at 12-13. Because there is no genuine issue of material fact as to whether the statements on the March 16, 2004 U-5 Form are substantially true, the Court will grant summary judgment in favor of Defendants with respect to the U-5 allegations of Plaintiff's defamation claim.

**4.    Failure to Raise a Genuine Issue of Fact Re: Malice**

The Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact as to whether the amended U-4 Forms and the U-5 Form were false. Supra at 10-16. Assuming, *arguendo*, a reasonable jury could find the U-4 or U-5 Forms false, however, the Court will grant summary judgment in favor of Defendants on the defamation claim because Plaintiff has failed to produce clear and convincing evidence of malice.

The parties agree that statements published in the U-4 and U-5 Forms are entitled to a qualified privilege. See Dkt. 44 at 6-9; Dkt. 50 at 7-11. The Court similarly finds that

1   Arizona law comports with the application of a qualified privilege because Defendants were

2   legally obligated to file the U-4 and U-5 Forms at issue here, see Dkt. 45 at ¶¶ 15, 17, Ex. D

3   at ¶¶2, 5, Ex. F at ¶3.  Green Acres Trust v. London, 688 P.2d 617, 616 (Ariz. 1984) (a

4   conditional privilege applies if the circumstances in which the communication was made

5   created an obligation to speak; whether a privileged occasion arose is a question of law for

6   the court); see Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 708 (7th Cir. 1994)

7   ("the [employer] has a qualified privilege to defame the employee on the U-5"); Fahnestock

8   & Co., Inc. v. Waltman, 935 F.2d 512, 516 (2d Cir. 1991) (employer's statements on

9   amended Form U-5 were subject to qualified privilege).

10      A plaintiff may establish abuse of a conditional privilege by demonstrating the

11   existence of either excessive publication or actual malice.  Green Acres Trust, 688 P.2d at

12   624; Lewis v. Oliver, 873 P.2d 668, 673 (Ariz. Ct. App. 1993).  Abuse through excessive

13   publication results from "publication to an unprivileged recipient not reasonably necessary

14   to protect the interest upon which the privilege is grounded."  Lewis, 873 P.2d at 673.

15   Abuse through actual malice occurs when the speaker makes a statement "with knowledge

16   of its falseness or with reckless disregard of whether it was true or not."  Id. The burden is

17   on the plaintiff to establish that a qualified privilege was abused, and "[u]nless only one

18   conclusion can be drawn from the evidence, the determination of the question whether the

19   privilege has been abused is for the jury."  Melton v. Slonsky, 504 P.2d 1288, 1291 (Ariz.

20   Ct. App. 1973); Miller v. Servicemaster By Rees, 851 P.2d 143, 146 (Ariz. Ct. App. 1992)

21   (issue of actual malice is jury question; if no evidence of malice, court can decide issue).

22      In order to demonstrate malice, a plaintiff must produce evidence that would permit a

23   reasonable jury to find by clear and convincing evidence that defendants knew the falsity of

24   their statements or had serious doubts as to their truth.  Dombey v. Phoenix Newspapers,

25   Inc., 724 P.2d 562, 573 (Ariz. 1986).  The clear and convincing standard of proof must be

26   considered in ruling on a motion for summary judgment.  Thus, a plaintiff must present

27   evidence from which a reasonable jury could find that proof of actual malice is clear and

28   convincing.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 254 (1986) (on summary

- 17 -

1   judgment, court must view evidence "through the prism of the substantive evidentiary

2   burden"); Dombey, 724 P.2d at 576 (evidence must permit reasonable jury to find actual

3   malice with "convincing clarity").  This is a substantial burden because it requires a plaintiff

4   to produce "'significant probative evidence.'" Dombey, 724 P.2d at 574 (quoting Anderson,

5   477 U.S. at 249, 256).   If the evidence presented at summary judgment "is of insufficient

6   caliber or quantity to allow a rational finder of fact to find actual malice by clear and

7   convincing evidence," the defendant should be granted summary judgment because the

8   evidence is insufficient as a matter of law.  Anderson, 477 U.S. at 254.

9          In an attempt to demonstrate actual malice, Plaintiff relies on the following

10  allegations: (1) the amended U-4 Form was filed after Plaintiff's disagreements with

11  Defendants surfaced in 2004 and after Defendants' "sham investigation" was concluded;

12  (2) Defendants informed Plaintiff he would be terminated based on a fraudulent VUL Policy

13  in order to "somehow relate Plaintiff's policy to a security so that [they] could have grounds

14  to terminate Plaintiff based on a securities related violation" (Dkt. 51 at ¶¶6-7); (3)

15  Defendants unilaterally amended Plaintiff's U-4 Forms and failed to inform him until

16  months later (Dkt. 50 at 3); (4) Plaintiff's NASD reportable information did not include Met

17  Life (Dkt. 50 at 4); and (5) Defendants conducted a "sham" investigation.  The Court finds

18  that no jury applying the "clear and convincing" evidentiary standard could reasonably find

19  actual malice from the factual allegations asserted by Plaintiff.  Anderson, 477 U.S. at 254.

20         First, the record clearly establishes that the U-4 Forms were amended and filed on

21  October 23, 2003, October 29, 2003, and February 13, 2004, *before* Plaintiff's

22  disagreements with Defendants surfaced in March 2004 and *before* he was investigated for

23  misconduct.  See Dkt. 45, Ex. E; Dkt. 57, Ex. G to Ex. A.  Because it is factually inaccurate,

24  no reasonably jury could find actual malice from Plaintiff's first allegation.

25         Second, Plaintiff has presented no evidence that Defendants informed him he would

26  be terminated based on a fraudulent VUL Policy, nor does the U-5 Form give the impression

27  that his termination "somehow relates" or is based on "a securities related violation."  See

28  Dkt. 45, Exs. A and B to Ex. F.  Although the March 16, 2004 U-5 Form states that, at the

1   time of termination, Plaintiff was under internal review for violating "investment-related

2   statutes, regulations, rules, or industry standards of conduct" (see Dkt. 45, Ex. A to Ex. F at

3   pp. 2-3), it further explains that the allegations against Plaintiff were "failure to abide by

4   Company policies and procedures."  Through uncontradicted affidavits, Defendants have

5   shown that they concluded Plaintiff violated the Company's ethics policy, which constitutes

6   a violation of "industry standards of conduct."  See Dkt. 45, Ex. D at ¶9; Dkt. 57 at ¶36, Ex.

7   B.  Moreover, neither securities nor VUL Policies are mentioned in the U-5 Forms.  To the

8   contrary, where the DRP asks for the "Principal Product Type" involved in the termination,

9   both U-5 Forms state, "No product."  See Dkt. 45, Exs. A and B to Ex. F at p. 5.  For these

10  reasons, no reasonable jury applying the clear and convincing standard of proof could find

11  actual malice from Plaintiff's second allegation.

12          Third, although Defendants unilaterally amended Plaintiff's U-4 Forms, Plaintiff has

13  submitted no evidence that Defendants failed to inform him of the amendments until months

14  later (Dkt. 50 at 3).  Rather, Defendants have presented undisputed evidence that "[t]he

15  normal protocol followed at TAG when making amendments to a registered representative's

16  U4 is to provide the registered representative with a copy of the amendment by fax," and,

17  further, that this procedure was followed with respect to Plaintiff's amendments.  Dkt. 45,

18  Ex. D at ¶¶3-4.  Moreover, even assuming, *arguendo*, Defendants failed to inform Plaintiff

19  of the U-4 amendments, the Court finds no reasonable chain of interference therefrom to the

20  conclusion that Defendants knowingly or recklessly included false information in the U-4

21  Forms.  Defendants have presented evidence that the preparer of the October 24, 2003 and

22  October 29, 2003 U-4 Forms is well-aware that all U-4 Forms are included in the CRD.  See

23  Dkt. 45, Ex. D at ¶3.  Because Plaintiff could have easily accessed his amended U-4 Forms

24  in the CRD, the evidence clearly cuts against the inference that Defendants would

25  knowingly or recklessly include false information therein.  Finally, both amendments to the

26  U-4 Forms were filed within weeks of Plaintiff's start date and long before "early 2004,"

27  when Plaintiff claims Defendants' "sham investigation" began, Dkt. 50 at 2-3.  See Dkt. 45,

28  Ex. E; Dkt. 57, Ex. G to Ex. A.  Under the clear and convincing standard, no reasonable jury

1   could find actual malice from Plaintiff's third allegation.

2       Fourth, Plaintiff has presented no evidence to support his assertion that the NASD

3   excused him from reporting the information about Met Life.  Defendants, by contrast, have

4   presented uncontradicted evidence that letters from the NASD declining to pursue an

5   investigation resulting from a termination do not excuse the termination itself from the U-4

6   reporting requirements.  Dkt. 45, Ex. D at ¶8.  No reasonable jury applying the clear and

7   convincing standard could find actual malice from Plaintiff's fourth allegation.

8       Fifth, Plaintiff has provided no evidence in support of his conclusory assertion that

9   Defendants conducted a "sham" investigation, or that Defendants knew or had serious

10  doubts about the conclusions of their investigation.  Although Plaintiff claims to have

11  provided the Court with e-mails from co-workers denying that he encouraged other sales

12  persons to engage in fraudulent practices, there is no evidence that this information was

13  presented to Defendants before Plaintiff was terminated.  See Dkt. 52, Ex. A.  Moreover,

14  Plaintiff himself has submitted e-mails and other documents which *concede* that, on two

15  occasions, he applied for high value insurance policies.  Dkt. 52, Ex. B at A01282.  Plaintiff

16  also submitted evidence demonstrating that he applied for a high value insurance policy

17  based on his inaccurate net worth calculation.  Dkt. 52, Ex. C.  No reasonable jury applying

18  the clear and convincing standard could find actual malice from Plaintiff's fifth allegation.

19      In short, Plaintiff has failed to provide any evidence – let alone clear and convincing

20  evidence – that Defendants knew the U-4 and U-5 Forms were false or uttered in reckless

21  disregard for their truth.  See Aspell v. Am. Contract Bridge League of Memphis, Tn., 595

22  P.2d 191, 193 (Ariz. Ct. App. 1979) (court can dispose of malice issue on summary

23  judgment where non-moving party presents no evidence of malice).

24      The Court finds that Plaintiff has failed to produce any evidence from which a

25  reasonable jury could find by clear and convincing evidence that Defendants made

26  defamatory statements about Plaintiff and knew that such statements were false or recklessly

27  disregarded the truth or falsity of such statements.  Thus, Defendants' motion for summary

28  judgment on Claim 1 (defamation) will be granted.

1

**B.  Claim 4:  Intentional Infliction of Emotional Distress**

2      In Arizona, three elements are necessary to establish a claim for intentional infliction

3   of emotional distress ("IIED"): (1) the employer's conduct must be "extreme and

4   outrageous"; (2) the employer must either intend to cause emotional distress or recklessly

5   disregard the near certainty that distress will result from his conduct; and (3) the employer's

6   conduct must have caused severe emotional distress.  Lucchesi v. Stimmell, 716 P.2d 1013,

7   1015-16 (Ariz. 1986); Ford v. Revlon, Inc., 734 P.2d 580, 585 (Ariz. 1987).  To recover for

8   IIED, Plaintiff must establish that Defendants' conduct was "'so outrageous in character,

9   and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded

10  as atrocious and utterly intolerable in a civilized community.'"  Johnson v. McDonald, 3

11  P.3d 1075, 1080 (Ariz. Ct. App. 1999) (citation omitted).  Indeed, even unjustifiable

12  conduct does not rise to the necessary level of "atrocious" and "beyond all possible bounds

13  of decency" to establish an IIED claim.  Nelson v. Phoenix Resort Corp., 888 P.2d 1375,

14  1386 (Ariz. Ct. App. 1994).  This standard distinguishes "true claims from false ones, and . .

15  . the trifling insult or annoyance from the serious wrong."  Godbehere v. Phoenix

16  Newspapers, Inc., 783 P.2d 781, 785 (Ariz. 1989) (quotation omitted).

17      It is for the court to determine whether the acts at issue may reasonably be regarded

18  as sufficiently extreme and outrageous to permit recovery.  Lucchesi, 716 P.2d at 1016;

19  Johnson, 3 P.3d at 1080; Nelson, 888 P.2d at 1386 (even if second and third elements of an

20  IIED claim are present, trial court must make a preliminary determination whether conduct

21  may be considered extreme and outrageous).   "Only when reasonable minds could differ in

22  determining whether conduct is sufficiently extreme or outrageous does the issue go to the

23  jury."  Mintz v. Bell Atl. Sys. Leasing Int'l, Inc., 905 P.2d 559, 563 (Ariz. Ct. App. 1995).

24  Given the high threshold of evidence required, courts recognize that "it is extremely rare to

25  find conduct in the employment context that will rise to the level of outrageousness

26  necessary to provide a basis for recovery for the tort of intentional infliction of emotional

27  distress."  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988), cited with

28  approval in Mintz, 905 P.2d at 564.  Here, Plaintiff clearly has not met this burden.

1    Plaintiff contends the following allegations establish "extreme and outrageous"

2    conduct sufficient to support an IIED claim: (1) Defendants amended the U-4 Forms

3    "without [his] knowledge"; and (2) Defendants "wrongfully terminated" him and accused

4    him of deceptive insurance schemes.  (Dkt. 1, Ex. A at ¶¶10-11; Dkt. 50 at 11-13.)

5    Even taking Plaintiff's allegations as true and construing them liberally in his favor,

6    the Court concludes that they are insufficient to state an IIED claim because the alleged

7    conduct is not sufficiently extreme and outrageous as a matter of law.  Defendants'

8    amendment of the U-4 Forms without Plaintiff's knowledge is not actionable because, as

9    previously discussed, (i) statements in the amendments were truthful and, even assuming

10   falsity, not made with "actual malice" (supra at 10-21); (ii) TAG was required by the NASD

11   to correct U-4 Forms within thirty days of first discovering any inaccuracy (see dkt. 45 at

12   ¶15, ex. D at ¶5); and (iii) TAG was required to correct Plaintiff's inaccurate U-4 Form even

13   without Plaintiff's signature (see dkt. 45, ex. D at ¶5).  Thus, Defendants' amendment of the

14   U-4 Forms did not exceed the bounds of decency in a civilized community.   See Perez v.

15   Curcio, 710 F.Supp. 259, 262 (D.Ariz.1989) (holding that the defendants' conduct of

16   demoting the plaintiff to an unsuitable position and beginning a "witch hunt" to "dig up"

17   good cause to terminate her when she challenged the demotion could "hardly be

18   characterized as 'outrageous,' 'extreme,' or 'beyond the bounds of human decency.'");

19   Baker v. Asarco, Inc., No. CIV-94-1045-PHX-ROS, 1995 WL 795663, at *7 (D.Ariz. Nov.

20   9, 1995) (finding no IIED claim as a matter of law where the plaintiff was forced to take a

21   medical leave of absence following his return to work after suffering a heart attack because

22   the defendant "didn't want him to die on company property").

23   Similarly, Plaintiff's assertion that Defendants "wrongfully terminated" him and

24   accused him of deceptive insurance schemes does not establish a triable claim for IIED

25   because Arizona courts have made clear that "[i]t is extremely rare to find conduct in the

26   employment context that will rise to the level of outrageousness necessary to provide a basis

27   for recovery for the tort of [IIED].'" Mintz, 905 P.2d at 563 (citation omitted).  In Bodett v.

28   Coxcom, Inc., 366 F.3d 736, 747 (9th Cir. 2004), for example, the plaintiff alleged that her

employer's conduct was "extreme and outrageous" because plaintiff, a professed Christian, (1) was accused of performing an "exorcism" on an openly gay subordinate, (2) was accused of proselytizing and harassing the same employee, and (3) was terminated without notice or severance pay, and lost her stock options, salary, and five weeks of vacation.  Id.  The Ninth Circuit affirmed the district court's rejection of Plaintiff's claim "[i]n light of the extremely high burden of proof for demonstrating intentional infliction of emotional distress in Arizona."  Id.  The Court specifically found that no reasonable jury could find the employer's actions in terminating plaintiff "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and regarded as atrocious and utterly intolerable in a civilized community.'"  Id. (citation omitted).

Accordingly, even if taken as true, Defendants' alleged conduct in this case simply does not rise to the level of outrageousness necessary to support an IIED claim.  See Nelson, 888 P.2d at 1386-87 (plaintiff did not provide evidence of outrageous and extreme conduct sufficient to survive summary judgment where plaintiff was called into office at 2:00 a.m., escorted by security to lobby and restroom, and fired in front of camera crews); see also Mintz, 905 P.2d at 563 (conduct of plaintiff's employer in failing to promote plaintiff, forcing plaintiff back to work sooner than doctor recommended, and hand delivering job reassignment letter to her in hospital cannot be regarded as atrocious and utterly intolerable in civilized society, even though employer knew of plaintiff's susceptibility to emotional problems).  The Court will grant the motion to dismiss with respect to the IIED claim.

Alternatively, the Court finds there is no evidence to support Plaintiff's assertion that Defendants "wrongfully terminated" him or improperly accused him of deceptive insurance schemes, and thus summary judgment on his IIED claim is appropriate for this reason as well.  First, this Court has already determined that Defendants did not wrongfully terminate Plaintiff.  See Dkt. 25.  Second, undisputed evidence demonstrates that Plaintiff applied for a $3 million life insurance on his own life by inaccurately representing his net worth to be $500,000 at a time when it was close to negative $400,000.  Plaintiff does not refute this evidence, but, at best, contends his net worth calculation was an unintentional error.

1    For both reasons, summary judgment will be granted on Plaintiff's IIED claim.

2    **C.    Claim 5: Negligence/Negligence Per Se**

3        **1.    There is No Genuine Issue of Material Fact as to Negligence**

4        In support of his negligence/negligence per se claim, Plaintiff alleges that Defendants

5    "owed a duty of due care toward to [sic] [him] herein under the common law and statutory

6    duties as previously set forth."  (Dkt. 1, Ex. A at ¶10.)  Although Plaintiff's Complaint fails

7    to identify any common law or statutory duty, he now claims that Defendants were negligent

8    because they violated NASD Rule 1140(c) when they amended the U-4 Forms without his

9    signature.  (Dkt. 50 at 13-14.)  The Court rejects this argument because Plaintiff cites no

10   legal authority to support his argument that NASD Rules create a duty between a brokerage

11   firm and its employees/brokers.  Rather, the only authority on this issue is to the contrary.

12       In Andrews v. Prudential Securities, Inc., 160 F.3d 304 (6th Cir. 1998), a brokerage

13   firm filed amended U-5 Forms with the NASD at a time when the broker/plaintiffs were no

14   longer working for the firm.  The broker/plaintiffs later filed a complaint alleging

15   defamation, intentional infliction of emotional distress, and negligence .  Id. at 305-06.

16   With respect to the negligence claim, the plaintiffs alleged that the brokerage firm's "act of

17   filing the U-5 Form with knowledge that they were false amounted to gross negligence."  Id.

18   at 310.  The Sixth Circuit rejected the negligence claim, finding instead that brokerage firms

19   are required to file U-5 Forms with the NASD when a broker's employment is terminated.

20   Id. at 305.  The Court recognized that the U-5 Form enables the NASD "to detect violations

21   and subsequently sanction persons for violations of the NASD's rules and other applicable

22   federal statutes and regulations."  Id.  Because the brokerage firm "furthered the NASD's

23   purpose of the U-5 Form filing requirement by informing the NASD of the conduct brought

24   to its attention," the Court determined that it was required to report the plaintiffs' conduct on

25   the U-5 Form.  Id. at 308-09, quoting NASD Notices to Members, No. 88-67 at p. 291.

26   Under the circumstances, the Sixth Circuit concluded that the brokerage firm did not breach

27   any duty, "if any were owed," to the plaintiffs.  Id. at 310.

28       The reasoning of Andrews is equally applicable here.  Defendants were under a legal

1   obligation to report to the NASD any information required by the U-4 Form that was not

2   disclosed by Plaintiff even if Plaintiff failed to physically sign the amended U-4 Form.  See

3   Dkt. 45 at ¶ 15, Ex. D at ¶5.  Although Plaintiff disagrees with Defendants' decision to file

4   the amended U-4s without his signature, Defendants' filings cannot be deemed the breach of

5   any duty owed to Plaintiff because they were affirmatively obligated by the NASD to amend

6   the U-4 Forms with or without Plaintiff's signature (id.).  See Andrews, 160 F.3d at 310.

7          Similar to the Sixth Circuit's holding in Andrews, the Ninth Circuit has concluded

8   that, although Congress required the SEC to adopt disciplinary rules, Congress did not

9   intend to create a private right of action for a violation of NASD rules.  See Jablon v. Dean

10  Witter & Co., 614 F.2d 677, 681 (9th Cir. 1980) ("[n]o provision in the Securities Exchange

11  Act explicitly provides for a private right of action for violations of stock association

12  rules"); Sparta Surgical Corp. v. NASD, 159 F.3d 1209, 1213 (9th Cir. 1998) (explaining

13  that "[i]t is undisputed . . . that a party has no private right of action against an exchange for

14  violating its own rules or for actions taken to perform its self-regulatory duties under the

15  [Securities Exchange] Act"); Niss v. NASD, 989 F.Supp. 1302, 1308-09 (S.D. Cal. 1997)

16  (finding no private right of action exists for the NASD's violations of its own rules and

17  dismissing plaintiff's common law negligence claims against the NASD").  Applying this

18  principle here, Plaintiff's claim against Defendants for allegedly violating the NASD rules

19  should also fail, as it is similar to allowing a private right of action for an alleged violation

20  of NASD rules.

21         Alternatively, the Court will grant summary judgment in favor of Defendants on the

22  negligence claim because Plaintiff has failed to demonstrate that expert testimony will be

23  available at trial to show that Defendants breached a duty owed Plaintiff by falling below

24  the accepted standard of care.  Under Arizona law, in order to maintain a negligence claim

25  against a licensed professional, a plaintiff must produce expert testimony to establish that

26  the defendant/professional breached a duty by falling below the accepted standard of care.

27  See Peacock v. Samaritan Health Serv., 765 P.2d 525, 528 (Ariz. Ct. App. 1988).  Several

28  Arizona cases have held that a plaintiff faced with a motion for summary judgment must

1    show that this expert testimony will be available at trial.  <u>Riedisser v. Nelson</u>, 534 P.2d

2    1052, 1054 (Ariz. 1975);  <u>Morrell v. St. Luke's Medical Center</u>, 556 P.2d 334, 335-36 (Ariz.

3    Ct. App. 1976); <u>Abernethy v. Smith</u>, 498 P.2d 175, 181 (Ariz. Ct. App. 1972).   Because

4    Plaintiff has failed to submit any expert testimony in support of his assertion that Defendants

5    fell below the standard of care by filing U-4 amendments without his signature, summary

6    judgment will be granted in favor of Defendants on Plaintiff's negligence claim.

7            Plaintiff's negligence claim fails for the additional reason that the theory behind such

8    claim is not supported by any evidence and, in fact, is contrary to undisputed evidence in the

9    record.  The theory behind Plaintiff's negligence claim is that Defendants "surreptitiously

10   amended his U-4 Forms without his knowledge to be in harmony with the U-5 they

11   eventually planned to file with the NASD."  (Dkt. 50 at 13.)  As previously discussed, the

12   U-4 amendments were filed within a few weeks of Plaintiff's association with Defendants

13   and several months before any issues arose with Defendants about Plaintiff's conduct.

14   <u>Supra</u> at 19.  Thus, there is absolutely no basis in fact to suggest that, in October 2003 when

15   TAG amended Plaintiff's U-4 Form, Defendants were aware that Plaintiff would engage in

16   behavior that caused them to conclude he was unethical and should be terminated.

17           **2.       <u>There is No Genuine Issue of Material Fact as to Negligence Per Se</u>**

18           To be liable for negligence per se, a person is required to violate a statute enacted for

19   the protection and safety of the public.  <u>Good v. City of Glendale</u>, 722 P.2d 386, 389 (Ariz.

20   Ct. App. 1986).  Specifically, the statute's purpose must be found (a) to protect a class of

21   persons which includes the ones whose interest is invaded; (b) to protect the particular

22   interest which is invaded; (c) to protect that interest against the kind of harm which has

23   resulted; and (d) to protect that interest against the particular hazard from which the harm

24   results.  <u>Id.</u>, citing Restatement (Second) Torts § 286.

25           The Court grants summary judgment in favor of Defendants on Plaintiff's negligence

26   per se claim for two reasons.  First, the NASD Rules are promulgated by the governing

27   board of the National Association of Securities Dealers.  Therefore, as a matter of law,  there

28   was no violation of a "statute" or "ordinance" by Defendants.  Second, as stated above,

1  "Congress's aim in providing for supervised self-regulation [in the securities industry by

2  organizations such as the NASD] was 'to insure fair dealing and to *protect investors* from

3  harmful or unfair trading practices.'" Credit Suisse First Boston Corp. v. Grunwald, 400

4  F.3d 1119, 1128 (9th Cir. 2005) (quotation omitted) (emphasis added).  Because the purpose

5  of the NASD is to protect investors, Plaintiff is prohibited as a matter of law from claiming

6  Defendants are liable under a theory of negligence per se for the alleged violation of an

7  NASD Rule.[6]

8  <div align="center">**DEFENDANTS' MOTION TO STRIKE**</div>

9  Defendants have filed a Motion to Strike Portions of Plaintiff's Statement of

10 Controverting Facts (dkt. 51).  (Dkt. 58.)  Much of the evidence Defendants seek to exclude

11 has no impact on the pending motion for summary judgment.  The Court only addresses the

12 evidentiary issues that are material to the pending motion for summary judgment.

13 Paragraph 1: Objections sustained.  Rationale: The assertion that Plaintiff "never

14 wrote a large insurance policy on my own life" is misleading, argumentative, and contrary to

15 the record, as Plaintiff himself has attached an application to obtain a high value insurance

16 policy on his own life.

17 Exhibits A.1-A.10: Objections to relevance and lack of authentication are sustained.

18 These exhibits are attached to support Plaintiff's assertion that he "never counsel[ed] anyone

19 else" to write a large insurance policy on their own lives, which is not relevant to any issue

20 before the Court.  See Dkt. 25.  Moreover, none of the exhibits have been properly

21 authenticated.

22 Paragraph 3: Objection to relevance sustained.  Rationale: Plaintiff's disagreement

23 with Defendants' conclusion that he *intentionally* used exaggerated numbers to calculate his

24 net worth is not relevant to any issue before the Court.  See Dkt. 25.

25 Paragraph 4: Objection to hearsay sustained.  Rationale: Statements made by an

26

27   [6]  Alternatively, the Court finds that Plaintiff has waived his right to assert a negligence per se

28 claim against Defendants because his response fails to respond to Defendants' arguments in support
   of the Court granting summary judgment on his negligence per se claim.  See Dkt. 50.

unidentified representative of Defendants is hearsay because Plaintiff has not set forth sufficient evidence to establish the existence of an agency relationship with Defendants under Fed.R.Evid. 801(d)(2)(D).  See Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th Cir. 1986) (finding statements of corporate agents to be hearsay because plaintiff "provided no evidence that either [of the agents] were involved in the [corporation's] discharge of [Plaintiff].").

Paragraph 5: Objection to hearsay sustained as to what unidentified representative of Defendants stated only.  Rationale: Same as paragraph 4.

Paragraph 6: Objections to hearsay and improper legal conclusion sustained.  Rationale: Same as paragraph 4.  Also, "wrongfully reported" is a legal conclusion.

Paragraph 7: Objection sustained as to lack of personal knowledge.

Exhibit E: Objections as to lack of foundation and lack of authentication are sustained.

Paragraph 8: Objections as to improper legal conclusion sustained.

Exhibits F-1 through F-4: Objections as to relevance and hearsay sustained.

Paragraph 9: Objections sustained as to lack of personal knowledge and not supported by any evidence in the record.

Paragraph 10: Objection sustained as to "even after its investigation proved otherwise" only.  Rationale: Not supported by any evidence in the record.

Paragraph 11: Objection sustained as to not supported by evidence in the record and lack of relevance.

Paragraph 14: Objection sustained as to "wrongfully published" only.  Rationale: Improper legal conclusion.

Paragraph 16: Objections sustained as to lack of relevance and speculative.

Paragraph 22: Objections sustained as to lack of evidentiary support.  Rationale: Plaintiff relies on his own affidavit in support of this statement.  However, Plaintiff's assertion that he has been unable to obtain employment in the financial services industry because of Defendants is not supported by the letter from American General, and thus is

1  inadmissible as speculative and lack of personal knowledge.  Also, Plaintiff's statement that

2  Defendants "double-crossed" him is argumentative.

3       Paragraph 23: Objections sustained as to impermissible legal conclusion and

4  speculative.

5                  **CONCLUSION**

6       Having carefully examined each of Plaintiff's remaining claims, the Court concludes

7  that Defendants have met their summary judgement burden by pointing to specific portions

8  of the submitted affidavits and documentary exhibits that show the absence of a genuine

9  issue of material fact as to each claim.  Plaintiff has failed to produce any actual evidence on

10 critical factual issues, as is required to create a genuine issue of material fact.  See Celotex,

11 477 U.S. at 323-24 (a principal purpose of summary judgment is "to isolate and dispose of

12 factually unsupported claims").

13      For all of the reasons stated above, the Court will grant Defendants' motion for

14 summary judgment on each of Plaintiff's remaining claims, defamation, intentional

15 infliction of emotional distress and negligence/negligence per se.

16      Accordingly,

17      **IT IS HEREBY ORDERED GRANTING**  Defendants' Motion for Summary

18 Judgment on Count One, Count Four and Count Five.  (Dkt. 44.)

19      **IT IS FURTHER ORDERED GRANTING IN PART** Defendants' Motion to

20 Strike Portions of Plaintiff's Statement of Controverting Facts.  (Dkt. 58.)

21      **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment

22 accordingly.

23      DATED this 27th day of September, 2006.

24

25

26                         Stephen M. McNamee

27                        United States District Judge

28